*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TODD WILLIAM CUNNINGHAM,

        Defendant-Appellant.

UNPUBLISHED
May 25, 2023

No. 359176
Muskegon Circuit Court
LC No. 19-005209-FC

Before: SHAPIRO, P.J., and REDFORD and YATES, JJ.

PER CURIAM.

A jury convicted defendant of conspiracy to commit armed robbery, MCL 750.529; MCL 750.157a; assault with intent to rob while armed, MCL 750.89; felon in possession of a firearm (felon-in-possession), MCL 750.224f; and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant appeals as of right. We affirm.

## I. BACKGROUND

Defendant's convictions arise from a conspiracy between defendant, Michael Monson, and Tabitha Bledsoe to rob a drug dealer named Mark Cheatum on August 13, 2019. Early that morning, Bledsoe called Cheatum to arrange purchasing drugs. Bledsoe met Cheatum on a street near defendant's home and according to defendant's instructions Bledsoe directed Cheatum to drive down a nearby alley where defendant and Monson lay in wait. However, the robbery attempt ultimately proved unsuccessful. While Bledsoe sat in Cheatum's vehicle in the alley, defendant and Monson approached on foot carrying guns and wearing masks and gloves. Monson shot at Cheatum's vehicle, but Cheatum escaped by running over Monson with his car and driving away. Defendant also repeatedly shot at the vehicle. Cheatum immediately drove to a police station to report the incident.

Bledsoe and Monson testified at trial admitting that they planned to rob Cheatum. The jury also viewed bodycam footage of Cheatum describing the incident to a police officer. Cheatum, however, did not testify at trial. The prosecutor also introduced surveillance video from inside and outside defendant's home on the morning of the incident. Defendant testified on his own behalf,

-1-

acknowledging that he armed himself with a gun and that he agreed to have Monson's "back." He maintained, however, that once outside in the alley, he and Monson abandoned their robbery plan. According to defendant's version of events, Cheatum repeatedly ran over Monson with his vehicle for no reason, and defendant shot at Cheatum in an attempt to save Monson's life. The jury convicted defendant and he now appeals.

## II. ANALYSIS

## A. CONFRONTATION CLAUSE

On appeal, defendant first argues that the trial court erred by admitting Cheatum's statements shown in the bodycam footage because Cheatum's statements were testimonial and their admission violated the Confrontation Clause given that defendant never had an opportunity to cross-examine Cheatum. Defendant, however, waived this issue at trial by affirmatively stating, twice, that he had no objection to the admission of the bodycam video. The affirmative approval constituted a waiver. See *People v McDonald*, 293 Mich App 292, 295; 811 NW2d 507 (2011). Alternatively, defendant contends that defense counsel provided ineffective assistance by failing to object to the admission of the bodycam footage. This ineffective-assistance claim lacks merit.

To fully address defendant's ineffective-assistance claim, we consider his underlying Confrontation Clause argument. "The Confrontation Clause of the Sixth Amendment bars the admission of testimonial statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness." *People v Walker*, 273 Mich App 56, 60-61; 728 NW2d 902 (2006) (quotation marks and citation omitted). When admitting Cheatum's statements in this case, the trial court relied on the ongoing-emergency doctrine, explained by the United States Supreme Court as follows:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. [*Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006).]

Factually, in *Davis*, the Court concluded that statements during a 911 call, describing events that were actually happening and seeking help "against a bona fide physical threat," were indicative of an "ongoing emergency," and that these statements were, therefore, nontestimonial. See *id*. at 827. In comparison, in a companion case, *Hammon v Indiana*, the victim was interviewed by police at her home, after an assault by her husband; she was interviewed in a separate room from her husband, and after answering questions, she signed an affidavit related to the events. *Id*. at 829-832. On these facts in *Hammon*, the Court concluded that the victim's statements to police at the scene of the crime, when "there was no immediate threat to her person,"

were not made while there was an emergency in progress and were instead a product of interrogation regarding the investigation of a possible crime. *Id.*

In this case, likening the current situation to the facts of *Hammon*, defendant argues that Cheatum's statements to Officer Trevon Durr were testimonial because Cheatum had reached a point of safety, and according to defendant, the emergency was, therefore, over. Defendant's argument proposes an overly-narrow reading of *Davis*, which the United States Supreme Court has itself rejected. In *Michigan v Bryant*, 562 US 344, 359; 131 S Ct 1143; 179 L Ed 2d 93 (2011), the Court provided "additional clarification with regard to what *Davis* meant by 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.' " Quoting *Davis*, 547 US at 822. Specifically, the *Bryant* Court explained that whether the "primary purpose" of an interrogation is to enable police to meet an ongoing emergency requires an objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties." *Bryant*, 562 US at 359. The Court recognized that *Davis* and *Hammon*— which both involved domestic-violence incidents with a known assailant who posed a threat to a specific victim—did not define the "outer bounds" of what constitutes an ongoing emergency; rather, "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 363. For example, even if a threat to an initial victim has been neutralized, an emergency may remain ongoing when there is a continued threat to the police or the general public or both. *Id.* at 363-364. In assessing a possible ongoing risk, the type of weapon—such as a gun as compared to the use of fists—should also be considered to determine whether a threat has been neutralized or an emergency remains ongoing. *Id.* at 364. The victim's medical state is also relevant and "provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public." *Id.* at 365. Also relevant are the motives of the interrogators and declarants during the questioning, as well as what is known to them or perceived by them regarding whether the emergency is ongoing, as evinced by the questions asked and the statements made. *Id.* at 368-376.

*Bryant* also clarified that *Davis*'s discussion of an ongoing emergency "should not be taken to imply that the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry." *Id.* at 366. "As *Davis* made clear, whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* "One additional factor is the informality of the situation and the interrogation. A formal station-house interrogation, like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Ohio v Clark*, 576 US 237, 245; 135 S Ct 2173; 192 L Ed 2d 306 (2015) (quotation marks and citation omitted).

In this case, viewing all the circumstances objectively, Cheatum's statements depicted in the bodycam video were nontestimonial. The record shows that, after being shot at by masked gunmen and running over one of the men with his car, Cheatum drove immediately to the police station where he spoke to Officer Durr in the parking lot. Although they were at the police station, this was not a formal, station-house interrogation. The conversation took place outside, in a public area, and in a disorganized fashion. See *Bryant*, 562 US at 366, 377. Both Cheatum and Bledsoe were excited and speaking over each other at times. One of the first things Cheatum can be heard to say is: "They trying to ambush me, trying to rob me." Both Cheatum and Bledsoe then described two masked men jumping out of the bushes and shooting at Cheatum's vehicle. Nothing in their

statements suggested that the shooting involved a "purely private dispute or that the threat from the shooter[s] had ended." Cf. *id*. at 372. Further, Cheatum and Bledsoe informed Officer Durr that one of the gunmen had been hit by Cheatum's vehicle so that a potentially injured man also in need of help remained at the scene, a fact which Officer Durr promptly relayed on his radio.[1] During the interview with Cheatum and Bledsoe, Officer Durr also asked whether they had been injured, and indeed, the portion of the video played for the jury ends with Officer Durr having Cheatum lift his shirt to determine whether Cheatum sustained any injuries from the gunfire.[2]

Objective consideration of all the circumstances in which Cheatum's statements were made reveals that an ongoing emergency existed to which police responded to reports of two gunmen firing at a vehicle, one of whom was struck by the car and may have been injured. Officer Durr asked questions designed to aid police in attempting to respond to that ongoing emergency and to determine whether Cheatum or Bledsoe—or others, including Monson—needed medical attention. The informality of the meeting—in the parking lot—also supports that Officer Durr responded to an ongoing emergency and that Cheatum would not have viewed his statement as being offered for use at a later trial. *Id*. at 378. The circumstances establish that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency. *Id*. Accordingly, Cheatum's statements were nontestimonial, and the Confrontation Clause did not bar the admission of the bodycam video. See *id*.

It also follows that defendant's ineffective-assistance claim lacks merit. Because the Confrontation Clause did not preclude the introduction of Cheatum's nontestimonial statements, any objection to the bodycam video on this basis would have been futile. Defense counsel did not provide ineffective assistance by failing to make a meritless objection. See *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012).

## B. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that the prosecution failed to present sufficient evidence to support his convictions for conspiracy to commit armed robbery and assault with intent to rob while armed. We disagree.

---

[1] Defendant appears to assert that no ongoing emergency existed because defendant called 911. However, there is no evidence that Cheatum, Bledsoe, or Officer Durr knew of defendant's 911 call; to the contrary, Officer Durr testified that he spoke to Cheatum before hearing of a 911 call or "anything like that." In any event, a single 911 call does not necessarily alleviate the emergency implicated by active shooters. During an ongoing emergency, particularly one involving active shooters, police might receive numerous 911 calls or reports by other means, and responding to that emergency involves gathering and making use of as much information as possible.

[2] The trial court appropriately recognized that an initially nontestimonial encounter may become testimonial, see *Davis*, 547 US at 828, and for this reason, the trial court appropriately limited the introduction of the video to the first eight minutes and 22 seconds, excluding another 35 minutes of footage.

We review de novo a challenge to the sufficiency of the evidence. *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005).

> When ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. [*Id*.]

Relevant to defendant's conspiracy conviction, under MCL 750.157a, "[a]ny person who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy . . . ."

> The gist of conspiracy lies in the illegal agreement; once the agreement is formed, the crime is complete. Michigan law requires no proof of an overt act taken in furtherance of the conspiracy. And, because the crime is complete upon the conspirators' agreement, the prosecution need not prove that the purpose contemplated by the unlawful agreement was accomplished. [*People v Seewald*, 499 Mich 111, 117; 879 NW2d 237 (2016) (quotation marks and citations omitted).]

"[D]irect proof of agreement is not required, nor is proof of a formal agreement necessary. It is sufficient that the circumstances, acts, and conduct of the parties establish an agreement. A conspiracy may be proven by circumstantial evidence or may be based on inference." *People v Cotton*, 191 Mich App 377, 393; 478 NW2d 681 (1991) (citations omitted). The prosecution need not prove the accomplishment of the underlying substantive offense "or even that the conspirators knew all the details of the conspiracy," but "must prove that "the intended future conduct they . . . agreed upon include[d] all the elements of the substantive crime." *People v Mass*, 464 Mich 615, 629 n 19; 628 NW2d 540 (2001) (quotation marks and citations omitted). "Conspiracy is a specific-intent crime, because it requires both the intent to combine with others and the intent to accomplish the illegal objective." *Id*. at 629.

> The elements of armed robbery, the substantive offense in this case, are:

> (1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007).]

In comparison, relevant to defendant's assault conviction, under MCL 750.89, "[a]ny person, being armed with a dangerous weapon, or any article used or fashioned in a manner to lead a person so assaulted reasonably to believe it to be a dangerous weapon, who shall assault another with intent to rob and steal shall be guilty of a felony . . . ." The elements of this offense are: "(1) an assault with force and violence; (2) an intent to rob or steal; and (3) the defendant's being

armed." *People v Akins*, 259 Mich App 545, 554; 675 NW2d 863 (2003) (quotation marks and citation omitted). The offense is a specific-intent crime, requiring evidence "that the defendant intended to rob or steal." *Id*. Regarding the assault to rob while armed offense, the jury was instructed on an aiding-and-abetting theory. See MCL 767.39. "A person who aids or abets the commission of a crime may be convicted as if he or she directly committed the crime." *People v Jackson*, 292 Mich App 583, 589; 808 NW2d 541 (2011).

> To support a finding that a defendant aided and abetted a crime, the prosecution must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*Id*. (quotation marks and citations omitted).]

Viewed in a light most favorable to the prosecution, the evidence at trial in this case established that, after calling Cheatum to arrange for the drug purchase, Bledsoe suggested robbing Cheatum when he arrived. Although evidence indicates that Bledsoe may have initially been "joking," defendant and Monson armed themselves with handguns, and donned masks and gloves. Monson, in particular, used a gun and gloves provided by defendant. Monson also specifically asked defendant if defendant would have "his back," and defendant answered affirmatively. Outside, they changed the angle of a surveillance camera so that it filmed the treetops rather than the backyard and alley. Defendant also instructed Bledsoe to have Cheatum drive down the alley. Consistent with that instruction, once in Cheatum's vehicle, Bledsoe directed him to drive down the alley where Monson jumped in front of Cheatum with a gun. Defendant also waited armed with a gun. Monson shot Cheatum's windshield, but Cheatum managed to avoid the robbery by striking Monson with his vehicle and driving away. Defendant appeared at Cheatum's driver's side window where he was seen "fumbling" with his gun. By his own admission, defendant then shot multiple times at Cheatum's vehicle. After the failed robbery attempt, defendant took steps to conceal the crime by removing the guns, masks, and gloves from the scene and returning those items to his house.

Viewing the evidence in a light most favorable to the prosecution, more than sufficient evidence supported defendant's conviction of assault with intent to rob while armed, either as a principal or an aider and abettor, and supported his conviction of conspiracy to commit armed robbery. See *Williams*, 268 Mich App at 419. Ample evidence supported the jury's findings of his guilt beyond a reasonable doubt.

## C. ONE-MAN CONSPIRACY

Regarding his conspiracy conviction, defendant also argues on appeal that his conviction cannot stand because there can be no one-man conspiracy and neither Bledsoe nor Monson were convicted of conspiracy. This argument lacks merit. "There can be no question that Michigan is a 'no one-man conspiracy' state." *People v Anderson*, 418 Mich 31, 35; 340 NW2d 634 (1983). "Our conspiracy statute [MCL 750.157a,] is a bilateral conspiracy statute which requires proof of an agreement between two or more persons." *Id*. For this reason:

> [I]f two are *tried together* for a conspiracy in which no additional persons are implicated, a verdict finding one guilty and the other not guilty requires a judgment of acquittal of both. The purpose of the rule at the common law was to prevent the enforcement of inherently defective or inconsistent verdicts in conspiracy cases. Such inconsistency resulted when, in the *joint prosecution* of several alleged conspirators, one co-conspirator was convicted while all of his alleged co-conspirators were acquitted. The effect analytically was that the fact-finder in such cases found simultaneously that an agreement between two or more persons existed and that it did not exist with regard to the same alleged conspirators. At common law the rule was easily applied since co-conspirators were always tried jointly and a per se rule fulfilled the rationale underlying the common-law no one-man conspiracy rule, precluding inherently defective or inconsistent verdicts. [*Id*. at 36 (quotation marks and citation omitted) (emphasis added).]

This rule, however, does not apply when coconspirators are tried "before separate factfinders." *People v Jemison*, 187 Mich App 90, 93; 466 NW2d 378 (1991). When multiple fact-finders are involved, there is "no inherent defect or inconsistency between the different verdicts." *People v Cummings*, 139 Mich App 286, 295; 362 NW2d 252 (1984).

In this case, Monson pleaded guilty to armed robbery. Bledsoe was charged with armed robbery, but she had not yet been convicted of any crime. Critical to defendant's one-man conspiracy argument, defendant was *not* tried jointly with either of his coconspirators. The jury that convicted defendant of conspiracy did not acquit either Monson or Bledsoe of conspiracy. No inherent defect or inconsistency in defendant's verdict occurred. See *Anderson*, 418 Mich at 36. Consequently, the no-one-man-conspiracy rule does not apply, and defendant is not entitled to have his conspiracy conviction vacated. See *Jemison*, 187 Mich App at 93.

## D. CONSTITUTIONAL AUTONOMY

Defendant contends that defense counsel violated his Sixth Amendment right to client autonomy by conceding defendant's guilt, and defendant contends that this amounts to a structural error under *McCoy v Louisiana*, ___ US ___, ___; 138 S Ct 1500, 1511; 200 L Ed 2d 821 (2018). Because defendant failed to raise this client-autonomy issue in the trial court, he failed to preserve it for appellate review. See *People v Vaughn*, 491 Mich 642, 654; 821 NW2d 288 (2012). We review defendant's unpreserved constitutional claim for plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Under the plain error rule, defendant bears the burden to prove: 1) an error occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights, i.e., prejudiced defendant by affecting the outcome or seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of defendant's innocence. *Id*. (citation omitted).

Defendant has not shown that any error occurred entitling him to relief. The Sixth Amendment grants an accused "the right to make a defense. As part of this right to make a defense, the Amendment speaks of the 'assistance' of counsel, thus contemplating a norm in which the accused, and not a lawyer, is master of his own defense." *Gannett Co, Inc v DePasquale*, 443 US 368, 383 n 10; 99 S Ct 2898; 61 L Ed 2d 608 (1979). Although lawyers may make decisions regarding trial management, there remain some decisions that "are reserved for the client—

notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *McCoy*, ___ US at ___; 138 S Ct at 1508. "Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category." *Id*. Consequently, "[p]resented with express statements of the client's will to maintain innocence . . . counsel may not steer the ship the other way." *Id*. at ___; 128 S Ct at 1509. A "counsel's admission of a client's guilt *over the client's express objection* is error structural in kind." *Id*. at ___; 138 S Ct at 1511 (emphasis added).

Factually, in *McCoy*, the defense attorney specifically conceded during opening statements that the defendant "committed three murders" and was "guilty." *Id*. at ___; 128 S Ct at 1505. Notably, the attorney made these concessions despite the fact that "the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." *Id*. Indeed, the defendant opposed the concession "of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id*. at ___; 128 S Ct at 1509. The defendant's vocal objections were a crucial fact in *McCoy*, distinguishing it from other cases in which a defendant never opposed a concession-of-guilt strategy until after trial and in which no structural error was found. Compare *id*., with *Florida v Nixon*, 543 US 175, 181, 185; 125 S Ct 551; 160 L Ed 2d 565 (2004) (involving a concession of guilt when the defendant was "generally unresponsive," never approved or protested the proposed strategy, and instead waited until after trial to complain about the admission of his guilt).

In this case, during closing arguments, defense counsel acknowledged that defendant, a felon, should not have had a gun in his possession, effectively conceding defendant's guilt of felon-in-possession. This, however, at most, served as a concession of guilt related solely to felon-in-possession. Defense counsel did not concede defendant's guilt on any other charge, but instead argued at length that defendant be found not guilty of all the other charges. Moreover, to the extent counsel acknowledged that defendant was a felon in possession of a firearm, defendant nevertheless has not shown error under *McCoy* because at no point, until this appeal, did defendant voice any concern or objection to counsel's concessions regarding felon-in-possession. See *McCoy*, ___ US at ___; 128 S Ct at 1509. Further, defendant presents no evidence that defense counsel conceded guilt on the felon-in-possession charge over defendant's express objections. To the contrary, defense counsel's concessions appear consistent with defendant's own testimony in this case in which he admitted possessing a gun. Absent evidence that defendant expressly told counsel that he wanted to maintain his innocence regarding felon-in-possession, this partial concession did not amount to structural error under *McCoy*.[3] See *id*.

---

[3] On appeal, aside from his constitutional-autonomy claim under *McCoy*, defendant also makes the cursory assertion that defense counsel provided ineffective assistance by conceding defendant's guilt. This argument also lacks merit. Defense counsel's concession related to felon-in-possession was entirely consistent with defendant's own testimony and the stipulation that defendant was ineligible to possess a firearm. When, as in this case, "the evidence obviously points to defendant's guilt, it can be better tactically . . . to admit guilt on some charges but maintain innocence on others." *People v Matuszak*, 263 Mich App 42, 60-61; 687 NW2d 342 (2004). See also *Nixon*, 543 US at 192 ("[C]ounsel cannot be deemed ineffective for attempting

-8-

## E. JURY INSTRUCTIONS ON DEFENSE OF OTHERS

Defendant also argues that the trial court should have instructed the jury on defense of others because he presented evidence that he shot at Cheatum to save Monson's life. Defendant, however, waived this issue when he approved the jury instructions at trial. See *People v Head*, 323 Mich App 526, 537; 917 NW2d 752 (2018). Alternatively, defendant argues that defense counsel provided ineffective assistance by failing to request such an instruction. Reviewing this issue in the ineffective-assistance context, we conclude that, even assuming that counsel performed unreasonably by failing to request such an instruction, defendant is not entitled to relief on appeal because a reasonable probability does not exist that the failure to request the instruction affected the outcome of the proceedings given the overwhelming evidence of defendant's guilt. See *Jackson*, 292 Mich App at 600-601.

To address defendant's ineffective-assistance claim, we consider his underlying contention that he was entitled to a defense-of-others instruction at trial regarding the assault with intent to rob while armed and felon-in-possession offenses.[4] "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Everett*, 318 Mich App 511, 527; 899 NW2d 94 (2017) (quotation marks and citation omitted). To obtain an instruction on an affirmative defense—such as defense of others—a defendant bears the burden of presenting "some evidence" from which the jury can find the essential elements of the defense. *People v Leffew*, 508 Mich 625, 644; 975 NW2d 896 (2022). This burden "is not a heavy one." *Id*. "Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction on the theory of defense." *Id*. (quotation marks and citation omitted). Once a defendant meets this burden of establishing a prima facie case, the prosecutor bears the burden of disproving the affirmative defense beyond a reasonable doubt. *Id*.

Relevant to defendant's defense-of-others argument, "[o]ne may use force in defense of another when he or she reasonably believes the other is in immediate danger of harm and force is necessary to prevent the harm; deadly force is permissible to repel an attack which reasonably appears deadly." *Id*. at 638 (quotation marks and citation omitted). "As with self-defense, defense of others is generally not available to a person who is the initial aggressor." *Id*. Further, generally, defense of others is only available as a defense when "the victim of an unlawful aggression is entitled under the law to use defensive force." 1 Wharton's Criminal Law, Defense of Others,

---

to impress the jury with his candor and his unwillingness to engage in a useless charade.") (quotation marks and citation omitted). Defense counsel did not provide ineffective assistance.

[4] We focus specifically on assault with intent to rob while armed and felon-in-possession because, on appeal, defendant argues that, if a defense-of-others instruction had been given, "[h]e would most likely have been found not guilty of Felon in Possession and Assault with Intent to Rob while armed." By failing to address whether such an instruction was warranted and would have affected the verdict respecting conspiracy to commit armed robbery or felony-firearm, defendant abandoned any such arguments. See *People v Henry*, 315 Mich App 130, 149; 889 NW2d 1 (2016).

§ 14:10 (16th ed). See also 1 Mich Civ Jur, Assault and Battery, § 29 ("[A] person's right of defense is no broader than the right of the person being defended.").

In this case, in the context of the other evidence presented, although defendant's testimony was, "weak" and "of doubtful credibility," nevertheless, defendant offered "some evidence" to support that he acted in defense of Monson. See *Leffew*, 508 Mich at 644. According to defendant's testimony, after deciding to rob Cheatum, arming themselves, donning masks and gloves, leaving the inside of the residence and changing the angle of an outside camera to record treetops instead of where Monson and defendant agreed to rob Cheatum; defendant and Monson changed their minds and agreed that they were not going to rob him. When they saw Cheatum's vehicle driving down the alley, they stepped to the sides of the alley to allow him to pass. But Cheatum did not pass and instead accelerated and drove at Monson, striking him with his vehicle for no reason. Defendant maintained that Cheatum then repeatedly drove forward and back over Monson, while defendant tried to pull Monson to safety and in this context he fired shots at Cheatum trying to save Monson. Consistent with defendant's testimony, defense counsel argued during closing argument that defendant simply acted "trying to save his friend's life" and did not intend to rob Cheatum.

Nevertheless, even if we agreed with defendant that counsel acted unreasonably by failing to request a defense-of-others instruction, defendant's ineffective-assistance claim would fail because defendant cannot establish prejudice. To establish prejudice, he "must show that but for counsel's deficient performance, a different result would have been reasonably probable." *People v Trakhtenberg*, 493 Mich 38, 55-56; 826 NW2d 136 (2012) (quotation marks and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted). Under this standard, a defendant does not have to show that, but for the error, he or she would have been ensured an acquittal, *id*. at 397, nor must a defendant show that counsel's failure more likely than not altered the outcome, *Harrington v Richter*, 562 US 86, 112; 131 S Ct 770; 178 L Ed 2d 624 (2011). Nevertheless, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id*. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *People v Dufek*, 980 NW2d 62, 63 (Mich, 2022) (quotation marks and citation omitted).

In this case, defendant contends only that a defense-of-others instruction would have altered the outcome respecting his assault-with-intent-to-rob-while-armed and his felon-in-possession convictions. However, respecting his felon-in-possession conviction, the evidence, including defendant's own testimony, established unequivocally that he armed himself with a gun in his house, well before Cheatum arrived, and well before any conceivable danger to anyone existed. In other words, defendant was not in "temporary" possession of a firearm in an attempt to "repel an imminent threat." *People v Triplett*, 499 Mich 52, 57; 878 NW2d 811 (2016). See also *People v Guajardo*, 300 Mich App 26, 40 n 4; 832 NW2d 409 (2013). On this record, no reasonable juror could conclude that defendant possessed a firearm in defense of Monson. As to his felon-in-possession charge, there is not a reasonable probability that a defense-of-others instruction would have altered the outcome. See *Trakhtenberg*, 493 Mich at 55-56.

Regarding the assault charge, considering the totality of the evidence before the jury, defendant cannot show prejudice. Again, the evidence established that Bledsoe, defendant, and

-10-

Monson agreed to rob Cheatum. To this end, defendant and Monson armed themselves with defendant's firearms and wore masks and gloves. Outside, they changed the angle of the surveillance camera to film the treetops rather than the backyard and alley. Defendant then instructed Bledsoe to have Cheatum drive down the alley and she did so. Although defendant claims that he and Monson agreed to abandon their plan, this conversation was not captured on the surveillance video. Further, no evidence indicates that they removed their masks or gloves, put away their guns, or took any other action which might suggest that they abandoned their plan. Although at trial defendant testified that he and Monson agreed to abandon the robbery, defendant acknowledged that he did not tell this to police during his interview and that he did not include this information in his written statement. Moreover, Monson, who testified at trial, did *not* testify that he and defendant agreed to abandon their plan. To the contrary, one of the last things Monson recalled was walking toward Cheatum's vehicle.[5] In addition to Monson's testimony, Cheatum and Bledsoe both stated that masked men jumped out of the bushes at the vehicle. Monson, in particular, was described as pointing his gun at the vehicle. Further, the bullet hole in the windshield strongly supports Cheatum's account that Monson in fact fired at the vehicle.

On the whole, the evidence overwhelmingly supported that Monson acted as the initial aggressor. He could not claim self-defense. It also follows that defendant, as a coconspirator aware of Monson's plans, could not claim that he acted in defense of Monson when he fired a gun at Cheatum. 40 Am Jur 2d, Homicide, § 160; 1 Wharton's Criminal Law, Defense of Others, § 14:10 (16th ed). Indeed, given his role in the events that day, defendant could also be considered an initial aggressor in his own right, which precludes him from claiming defense of others. See *Leffew*, 508 Mich 638. Cheatum, in the meantime, made a U-turn to drive away, driving through someone's yard as he did so. Sergeant Shaun Kozal's testimony of the scene tended to corroborate this description of the evasive action. Although defendant claimed that Cheatum repeatedly drove forward and back over Monson, no physical evidence on the vehicle—such as blood or hair—supported that the vehicle came in repeated contact with Monson.

After the confrontation, Cheatum drove directly to the police station to report the matter. Defendant, however, took steps to conceal his actions by collecting the guns, masks, and gloves and returning them to his house.

The totality of the evidence presented to the jury, including Bledsoe, Monson, and Cheatum's testimonies, the surveillance videos, and the physical evidence, contradicted defendant's version of events. Indeed, although not instructed on the defense of others, the jury heard defendant's theory that he lacked the intent to rob and acted to save Monson, but the jury rejected this theory and specifically concluded that defendant acted with the intent to rob. On this record, there is not a reasonable probability sufficient to undermine confidence in the verdict respecting defendant's assault-with-intent-to-rob-while-armed conviction. See *Harrington*, 562 US at 112; *Ackley*, 497 Mich at 389.

---

[5] Monson, who suffered injury when hit by Cheatum's vehicle, testified that he did not "remember a whole lot from that day."

-11-

F.  INEFFECTIVE ASSISTANCE OF COUNSEL

In addition to the ineffective-assistance claims already addressed, defendant offers a long list of complaints about defense counsel's performance, all of which lack merit.  Whether the defendant received the effective assistance of counsel is a mixed question of fact and law.  *Ackley*, 497 Mich at 388.  We review a trial court's findings of fact, if any, for clear error, and review de novo questions of constitutional law.  *Id*.  When, as in this case, a *Ginther*[6] hearing has not been held, review is generally limited to mistakes apparent on the record.  *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).  We note, however, that defendant moved this Court to remand for a *Ginther* hearing,[7] and in this context, the evidence presented by defendant on appeal may be considered for the limited purpose of deciding whether a remand for an evidentiary hearing is warranted.  See *People v Moore*, 493 Mich 933; 825 NW2d 580 (2013).

"To establish ineffective assistance of counsel, defendant must show (1) that defense counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's errors, a different outcome would have resulted."  *Jackson*, 292 Mich App at 600-601.  "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise."  *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).  "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim."  *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).  "This Court will not second-guess counsel on matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight."  *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015) (quotation marks and citation omitted).

1.  CROSS-EXAMINATION OF DETECTIVE ANTONIO PEREZ

Defendant first contends that defense counsel provided ineffective assistance by failing to question Detective Perez about a laboratory report, which, according to defendant, could have been used to establish a third gun in the alley fired by Cheatum.  How to cross-examine witnesses is presumed to be a matter of trial strategy, see *id*., and on the existing lower court record, which did *not* include the laboratory report, defendant has not overcome the presumption that counsel's decisions were a matter of sound trial strategy, nor has he shown that a reasonable probability exists that cross-examining Detective Perez about the report would have affected the outcome of the proceedings.  See *Jackson*, 292 Mich App at 600-601.

Considering the laboratory report and evidence of a forfeiture proceeding against Cheatum, defendant also has not shown that there is a need to remand for a *Ginther* hearing on this issue.

---

[6] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[7] Defendant's remand motion was previously denied "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar." *People v Cunningham*, unpublished order of the Court of Appeals, entered July 21, 2022 (Docket No. 359176).  Having again considered the issue, for the reasons explained in this opinion, we again deny defendant's request for a *Ginther* hearing.

See *Moore*, 493 Mich at 933. First of all, it is unclear why defendant singles out Detective Perez as someone to question about the laboratory report or the possibility of a third gun. The report itself is inadmissible hearsay. See *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). Detective Perez did not author the report and there is no evidence that he would have the qualifications or knowledge to opine that nine-millimeter cartridges found in the alley could not have been fired from the guns found in defendant's home. Defendant simply speculates that Detective Perez could have offered favorable testimony if questioned about the ballistics report, but such speculation does not support an ineffective-assistance claim, nor does it warrant remand for a *Ginther* hearing. See *Payne*, 285 Mich App at 190; MCR 7.211(C)(1).

Second, an obvious problem with defendant's third-gun theory is that *no one*—including defendant—testified that Cheatum fired a gun in the alley. Establishing that there were nine-millimeter, Luger cartridges in the alley that did not match defendant's gun or the gun used by Monson, would not have aided the defense because there would still be no evidence to link those cartridges to Cheatum or place a gun in Cheatum's hand.[8] Indeed, defendant's basic argument on appeal appears to be that establishing the presence of a third gun in the alley would have aided his defense-of-others theory. But absent testimony that defendant believed that Cheatum fired or possessed a gun, evidence about cartridge casings later found in the alley has no bearing on what defendant honestly and reasonably believed when he fired at Cheatum. See *Leffew*, 508 Mich at 638, 651. Defendant cannot establish that his counsel provided ineffective assistance of counsel related to Detective Perez, and he has not shown that a remand is warranted on this issue. See MCR 7.211(C)(1).

## 2. CROSS-EXAMINATION OF BLEDSOE

Defendant next argues that defense counsel failed to effectively cross-examine Bledsoe regarding her purchase of heroin and whether Cheatum possessed or fired a gun during the incident. Defendant also argues that defense counsel should have impeached Bledsoe using the video of her interview with police to establish that she had something—possibly heroin—in her pants which she then put in her cheek. Defendant's arguments in this regard lack merit.

---

[8] In his Standard 4 brief, defendant also asserts that the ballistics report shows that none of the bullet fragments from Cheatum's vehicle and none of the casings in the alley matched defendant's weapons. In making this argument on the basis of the laboratory report, defendant impermissibly attempts to expand the record. See *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). Instead, we consider the ballistics report only as it relates to defendant's request for a *Ginther* hearing. See *Moore*, 493 Mich at 933. In any event, contrary to defendant's representations in his Standard 4 brief, the ballistics report indicates that there were cartridge casings found that were identified, "to a degree of practical certainty," as having been fired by one of defendant's weapons. The analysis of other items, including a bullet fragment, was "inconclusive" regarding the second gun, meaning that they could not be excluded or identified as having been fired by that weapon. It was not determined that *none* of the fragments or casings could have been fired by either of defendant's firearms. We also note that defendant fully admitted at trial and in his statements to police that he repeatedly shot at Cheatum's vehicle in the alley.

-13-

Again, how to question witnesses is presumed to be a matter of trial strategy, and defendant has not overcome the presumption that counsel provided effective assistance. See *Putman*, 309 Mich App at 248. Defense counsel cross-examined Bledsoe at length. Both in her direct and cross-examination testimony, Bledsoe admitted her drug addiction and her desire to obtain heroin. On this record, defendant has not shown that counsel provided ineffective assistance by failing to ask her additional questions about heroin or whether Bledsoe had heroin in her pocket during her interview with police,[9] nor has he shown that such questions would have had any effect on the outcome of the proceedings. See *Jackson*, 292 Mich App at 600-601. Defendant also has not shown that counsel provided ineffective assistance by failing to question Bledsoe about whether Cheatum possessed a gun. Defendant bears the burden of establishing the factual predicate of his claim, see *Carbin*, 463 Mich at 600, and there is simply no evidence that Bledsoe saw Cheatum with a gun on the day in question. Absent such evidence, defendant cannot establish that defense counsel should have questioned Bledsoe about a gun or that such questions would have affected the outcome of the proceedings. Defendant received the effective assistance of counsel regarding Bledsoe, and a remand for a *Ginther* hearing is not warranted. See MCR 7.211(C)(1).

### 3. FAILURE TO CONSULT A GUN EXPERT

Defendant also argues that defense counsel provided ineffective assistance by failing to consult a "gun expert" to establish that the hole in the windshield of Cheatum's car was made by a shot being fired from inside the vehicle rather than outside the vehicle. This argument fails because defendant has failed to establish a factual predicate of his claim. See *Carbin*, 463 Mich at 600. Defendant merely speculates that a "gun expert" would have benefited the defense, but he fails to offer any proof that an expert witness would have testified favorably for the defense. See *Payne*, 285 Mich App at 190. No expert opinions about the bullet hole appear in the lower court record, nor has defendant identified an available expert whose opinion he wishes to develop on remand. In these circumstances, defendant's claim that defense counsel provided ineffective assistance by failing to consult a gun expert lacks merit. See *id.* Remand for a *Ginther* hearing is unwarranted. See MCR 7.211(C)(1).

### 4. FAILURE TO CALL AN UNIDENTIFIED POLICE OFFICER

Next, defendant contends that defense counsel provided ineffective assistance by failing to call a responding police officer to testify at trial. Decisions whether to call and question witnesses are presumed to be matters of trial strategy. See *Putman*, 309 Mich App at 248. On the existing record, which includes no information whatsoever about the police officer, defendant cannot establish that defense counsel provided ineffective assistance by failing to call an additional police officer as a witness. See *Payne*, 285 Mich App at 190.

Considering the additional information provided by defendant on appeal, defendant also has not shown that a remand for a *Ginther* hearing is warranted. See *Moore*, 493 Mich at 933. In arguing that defense counsel should have called an additional police officer to testify, defendant

---

[9] Bledsoe's police interview is not part of the lower court record, but we consider it, or at least the still shots from the video as provided by defendant, to determine whether a *Ginther* hearing is warranted. See *Moore*, 493 Mich at 933.

does not provide the officer's name or many details about the officer's purported role in the case. From the little information that defendant states, it appears that the officer responded to the alley and spoke with defendant at the scene at some point. Defendant maintains that bodycam footage of this interaction exists, and he asserts that the bodycam footage could have been admitted as excited utterances. Defendant failed, however, to provide that bodycam video to this Court. At most, in his brief, he selectively recounts statements that he asserts he made to the officer and remarks made by the police officer. Defendant's ineffective-assistance claim related to the unidentified officer and bodycam footage lacks merit.

Without the actual bodycam video, one cannot conclude that such video would have been favorable to the defense. Moreover, the video is undoubtedly hearsay, and without the video and without additional details about the circumstances in which the video was made, it cannot be concluded that the excited-utterance exception, or any other hearsay exception, applies. See MRE 801; MRE 802; MRE 803; MRE 804. Absent a basis to conclude that the video contained admissible evidence favorable to the defense, defendant cannot overcome the presumption that counsel's decisions regarding the presentation of evidence were a matter of sound trial strategy, see *Putman*, 309 Mich App at 248, and he cannot establish that defense counsel provided ineffective assistance by failing to introduce the bodycam video. See *Jackson*, 292 Mich App at 600-601. Defendant also has not shown that a remand is warranted on this issue. See MCR 7.211(C)(1).

### 5. FAILURE TO REVIEW SURVEILLANCE VIDEOS

Defendant also contends that defense counsel provided ineffective assistance relative to surveillance videos from defendant's home security system. First, according to defendant, defense counsel provided ineffective assistance by failing to obtain and to review surveillance videos. There is, however, no record support for the factual predicate of defendant's claim, and on the existing record, his ineffective assistance claim lacks merit. See *Carbin*, 463 Mich at 600. Indeed, defense counsel's statements at trial bely defendant's claim that defense counsel did not view surveillance video before trial. For example, during jury selection and a discussion whether a prospective juror with hearing difficulties should be dismissed, defense counsel specifically mentioned the surveillance video, stating that he and the prosecutor "were sort of laughing about it. We can't—I mean, I can't hear much of it. And you know, I think I have okay hearing." Defense counsel also clearly demonstrated his familiarity with the videos as evinced by his cross-examination of witnesses and his comments during opening statement and closing argument. To suggest that defense counsel did not review the videos is unsupported by the record.

Defendant also more specifically argues that defense counsel failed to review the videos *with defendant*. To support his request for a remand, defendant provides this Court with his own affidavit in which he asserts that he asked defense counsel to obtain the surveillance video for him to view but that counsel did not do so because counsel believed that the case would be dismissed in the absence of Cheatum's appearance as a witness.[10]

_____

[10] Defendant's affidavit is not part of the lower court record, but it may be considered to determine whether a *Ginther* hearing is warranted. See *Moore*, 493 Mich at 933.

Even accepting defendant's assertion that defense counsel failed to obtain a copy to review with defendant, defendant has not shown that a remand is warranted because he cannot establish that counsel's failure to view the videos with defendant had any effect on the proceedings. Defendant entirely fails to explain how the proceedings would have been different if he and counsel reviewed the surveillance videos together. Defendant personally appeared on the videos, meaning he had his own personal recollection of events, and the surveillance videos were played at trial *before* defendant testified. Further, ultimately, defense counsel extensively cross-examined witnesses about the videos, and defense counsel used the videos during closing arguments to argue that the videos did not prove that a meeting of the minds regarding a conspiracy to rob Cheatum existed. Defendant has not established that his counsel denied him the effective assistance of counsel regarding reviewing the videos together, see *Jackson*, 292 Mich App at 600-601, and he has not shown that there is any need for a remand on this issue, see MCR 7.211(C)(1).

Related to the surveillance videos, defendant also asserts that there is footage missing between 5:06 a.m. and 5:59 a.m., and according to defendant, this missing portion would "include significant conversation if there actually had been a conspiracy." Defendant also asserts in a cursory fashion that defense counsel "was unaware of the missing gaps." No record supports whether defense counsel noticed gaps in the video. Further, defendant fails to explain, for purposes of his ineffective-assistance claim, how he suffered prejudice by a gap in the video. Given his insufficient briefing of the issue, we consider defendant's ineffective-assistance claim regarding this missing footage abandoned. See *People v Henry*, 315 Mich App 130, 149; 889 NW2d 1 (2016). In any event, as discussed, the evidence in this case overwhelmingly established that, after the gap in the video about which defendant now complains, he and Monson armed themselves with guns, donned masks and gloves, and went outside to rob Cheatum, and defendant fired his weapon at Cheatum. Given the events that followed, defendant has not shown that counsel's failure to obtain the footage between 5:06 a.m. and 5:59 a.m. affected the outcome of the proceedings. In sum, without more, defendant has not shown that he was denied the effective assistance of counsel, see *Jackson*, 292 Mich App at 600-601, and he has not shown that there is any need for a remand on this issue, see MCR 7.211(C)(1).

## 6. TIME OF THE SEARCH OF DEFENDANT'S HOME

Relying on statements made by defense counsel at sentencing, defendant also argues that the surveillance video, coupled with defendant's interrogation video, would have shown that the police searched his home before they obtained a warrant or defendant's consent for the search. According to defendant, defense counsel was ineffective for failing to investigate this issue. This argument fails because defendant bears the burden of establishing the factual predicate of his claim, see *Carbin*, 463 Mich at 600, and defendant failed to provide this Court with a record to support that the police searched his home before obtaining a warrant or his consent or both.

At trial, Detective Perez testified that the police had both a search warrant and a signed consent "in hand" when they searched defendant's home, and no evidence in the lower court record contradicts this testimony. Even on appeal, while seeking a remand, defendant failed to provide this Court with an offer of proof to support his assertions. Defendant claims that his interrogation video establishes the timing of his consent. Yet, in response to this Court's request for a recording of the interrogation admitted at trial, defendant provided this Court with a video without any audio and without any time stamps, despite his claim that there is a time stamped video showing when

he gave his consent to search.[11]  He also failed to provide this Court with the warrant or any evidence to establish the time that the police executed the search.[12]  There is, in short, no factual support for defendant's argument that police searched his home before obtaining a warrant or his consent.  Absent an offer of proof to support his claim, he has not shown a need for a remand on this issue.  See MCR 7.211(C)(1).

Moreover, regarding defendant's search-related claim, we also note that defendant's briefing of the issue—both by defense appellate counsel and in defendant's Standard 4 brief—is devoid of any legal analysis regarding the significance of his timing argument.  Presumably defendant believes that he could have moved to suppress evidence from the search if the police entered his home before obtaining a warrant or his consent, but he wholly fails to brief the issue.  By failing to brief the issue, defendant has abandoned it.  See *Henry*, 315 Mich App at 149.  Absent a legal argument or a factual basis for his complaints regarding the timing of the police search, defendant has not shown that defense counsel provided ineffective assistance by failing to investigate the issue more thoroughly, see *Jackson*, 292 Mich App at 600-601, and he has not shown that there is any need for a remand on this issue, see MCR 7.211(C)(1).

## G.  DESTRUCTION OF EVIDENCE

Next, defendant argues that he was denied due process because the police, in bad faith, destroyed surveillance video from defendant's home for the time between 5:06 a.m. and 5:59 a.m., shortly before defendant and his coconspirators attempted to rob Cheatum in the alley.  Defendant failed to raise this issue in the trial court.  We review the unpreserved issue for plain error.  See *People v Dickinson*, 321 Mich App 1, 15; 909 NW2d 24 (2017).  Defendant has not established plain error.  See *id.*

"To warrant reversal on a claimed due-process violation involving the failure to preserve evidence, a defendant must prove that the missing evidence was exculpatory or that law enforcement personnel acted in bad faith."  *Id.* (quotation marks and citation omitted).  In this

---

[11] In his Standard 4 brief, defendant also raises an argument regarding the timing of the search, specifically that the video would show that he gave his consent to the search at 10:41 a.m.  The consent form signed by defendant, which was admitted at trial as defense Exhibit A, however, indicated that defendant gave his consent at 9:33 a.m.  Regardless, there is ultimately no factual support for defendant's argument that police searched his home before obtaining a warrant or his consent.  See *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000).

[12] With his Standard 4 brief, defendant provides this Court with one, unsigned page of what appears to be at least a 10-page report, and defendant contends that this document supports that the search took place at 8:55 a.m.  This document discusses a number of activities by police, including talking with Cheatum, speaking with Bledsoe, arresting defendant, and executing a search warrant on defendant's home.  The document does not state the time that the search occurred.  This document is also not part of the lower court record, meaning that, at most, we consider it to determine whether a *Ginther* hearing is warranted.  See *Moore*, 493 Mich at 933.  We see no need for such a hearing in this case.

context, there is a difference between material exculpatory evidence and evidence that is only "potentially useful." *Arizona v Youngblood*, 488 US 51, 57-58; 109 S Ct 333; 102 L Ed 2d 281 (1988). "When the evidence is only 'potentially useful,' a failure to preserve the evidence does not amount to a due-process violation unless a defendant establishes bad faith." *Dickinson*, 321 Mich App at 16 (citation omitted). A defendant bears the burden of establishing either that the evidence was exculpatory or that police acted in bad faith. *Id*.

In this case, defendant appears to concede that the videos are not material exculpatory evidence. At most, he asserts that the videos were "potentially useful." Consequently, defendant bears the burden of establishing bad-faith destruction of evidence. See *id*. On the existing record, there is no factual support for defendant's contention that the police destroyed any video evidence. As the appellant, defendant bears the burden of providing this Court with "a record to verify the factual basis of any argument upon which reversal was predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Yet, defendant points to nothing in the lower court record to support his claim, and he did not seek to expand the record to develop this issue by requesting an evidentiary hearing.[13] See *id*. Absent factual support, defendant has not shown that error occurred.

Although the lower court record is devoid of support of his arguments, defendant attempts to expand the record on appeal by providing this Court with two documents: a report from December 2022, after the trial in this case, which noted that defendant's DVR had been reformatted, and a Muskegon Heights Police Department incident report dated August 13, 2019, which lists various property items, including a DVR. Appeals to this Court "are heard on the original record," MCR 7.210(A), and generally, a litigant may not expand the record on appeal, *People v Nix*, 301 Mich App 195, 203; 836 NW2d 224 (2013). For this reason, we need not consider the additional materials submitted by defendant. See *id*. And the fact remains that the record does not support defendant's claims.[14]

---

[13] As noted, defendant moved this Court to remand for a *Ginther* hearing. He has not, however, requested an evidentiary hearing on his destruction-of-evidence claim, and this issue was not included in his motion to remand.

[14] Even if we considered the additional documents, see MCR 7.216(A)(4), we would conclude that defendant failed to establish a clear or obvious error in this case. First of all, from the documents, there is some question whether the DVR was in the possession of the police or whether it was most recently in the possession of defendant's sister, meaning that it is not clear or obvious that the *police* destroyed any evidence. More significantly, even assuming that the police failed to preserve evidence, under a plain-error standard, defendant cannot show prejudice related to the loss of the video. Defendant would have personally appeared in the video, and absent a memory loss, which defendant does not claim, he should have a recollection of what occurred. Cf. *People v Huttenga*, 196 Mich App 633, 644; 493 NW2d 486 (1992). Yet, defendant does not even attempt to identify anything favorable to the defense that occurred during that time. Further, from the footage that has been provided, the audio is virtually indecipherable, meaning that it is highly unlikely that the missing video captured any conversation. Moreover, regardless what occurred on the video during the period in question, the circumstances that followed overwhelmingly demonstrated defendant's

## H. EVIDENCE OF MONSON'S GUILTY PLEA

Defendant's final argument in his Standard 4 brief is that Monson's plea was improperly admitted for use against defendant.[15] This unpreserved argument lacks merit. It is "an established rule that conviction of an accomplice is not substantive evidence of a defendant's guilt . . . ." *People v Standifer*, 425 Mich 543, 552 n 4; 390 NW2d 632 (1986) (opinion by BOYLE, J.). Evidence of an accomplice's plea or conviction may, however, be admissible as bearing on the accomplice's credibility as a witness. See *id*. at 556. Further, inconsistencies between an accomplice's statements when taking a plea as compared to his or her testimony at a trial may be used for impeachment. See *id*. at 557-558. Moreover, a prosecutor may generally offer this testimony during direct examination without waiting for a defendant to attack the accomplice's credibility. *People v Manning*, 434 Mich 1, 19; 450 NW2d 534 (1990) (opinion by BOYLE, J.). See also *People v Lindsay*, 69 Mich App 720, 723; 245 NW2d 343 (1976) ("The practice of eliciting from a witness on direct examination facts concerning his prior convictions is a common trial strategy . . . .").

In this case, the prosecution did not attempt to use Monson's guilty plea as substantive evidence against defendant, nor did the prosecution advance an argument that defendant should be found guilty by association because Monson pleaded guilty. Instead, the prosecution offered evidence that Monson pleaded guilty to armed robbery. Defense counsel later asked Monson a question about his admissions during his plea, and on redirect, the prosecution asked a follow-up question, clarifying that, at his plea hearing, Monson answered "yes" when asked if he went to the alley intending to take money from Cheatum. During closing argument, the prosecution argued that Monson did not appear at trial to help the prosecutor, rather, if anything, he sought to help defendant. The prosecution also maintained that Monson did not really "have a dog in the fight" because he had already entered a guilty plea.

Defendant did not object to any of this at trial, and indeed, defense counsel contributed to any potential error by asking about Monson's statements during his plea agreement. Ultimately, the prosecution did not use Monson's plea as substantive evidence against defendant. Instead, at

---

guilt. That is, as discussed, he armed himself with a gun, and donned gloves and a mask. Outside, he instructed Bledsoe to have Cheatum drive down the alley, and he joined Monson in attempting to rob Cheatum. Indeed, he repeatedly fired his gun at Cheatum. In this context, defendant cannot show that the footage in question would have had any effect on the outcome of the proceedings, and he is not entitled to relief on appeal. See *Dickinson*, 321 Mich App at 17.

[15] As one of the arguments in his Standard 4 brief, defendant also provides a lengthy list of purportedly false or misleading factual statements in the prosecutor's appellate brief. Defendant fails, however, to develop a legal argument of any kind or to cite any relevant legal authority whatsoever, and it is unclear what relief, if any, defendant seeks. By failing to adequately brief the matter, defendant has abandoned this issue. See *Henry*, 315 Mich App at 149. Nevertheless, we note that, as in all our cases, we have compared both parties' factual representations "to the actual record on appeal," 5 Longhofer, Michigan Court Rules Practice, Forms, § 121:15 (2022), and it is the lower court record, not the parties' factual assertions in their briefs, on which we rely in resolving the issues in this appeal.

most, the prosecution addressed Monson's plea in the context of arguments regarding his credibility. The way this was accomplished was the prosecution anticipating the impeachment of the defense and eliciting this evidence on direct exam. As indicated above, this practice is allowed under *Manning*, 434 Mich at 18-19. Defendant has not shown plain error in the admission of evidence about Monson's plea and Monson's statements during his plea hearing as bearing on his credibility. See *Standifer*, 425 Mich at 557-558. Defendant, therefore, is not entitled to relief on appeal.

## III. CONCLUSION

For the reasons set forth above, we affirm.

/s/ Douglas B. Shapiro
/s/ James Robert Redford
/s/ Christopher P. Yates